NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued June 9, 2015
Decided July 1, 2015

**Before**

RICHARD A. POSNER, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

No. 14-3497

|  |  |
|---|---|
| ERIC LEE CAPMAN, | Appeal from the United States District Court for the Northern District of Indiana, Fort Wayne Division. |
| *Plaintiff-Appellant*, |  |
| *v.* |  |
|  | No. 1:13cv286 |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | William C. Lee, |
| *Defendant-Appellee*. | *Judge*. |

**O R D E R**

Eric Capman, at age 42, applied for disability benefits and supplemental security income after mental and physical impairments left him unable to work. An administrative law judge ("ALJ") denied benefits, finding that Capman retained the residual functional capacity ("RFC") to perform work at all exertional levels but with certain limitations. Capman challenges this RFC determination and particularly the ALJ's omission of other limitations that he claims are necessary. The district court rejected this argument and we affirm.

## I. Background

In 1987 Capman enlisted in the Navy, where he was a member of a fighter squadron that was deployed aboard an aircraft carrier. During his time in the Navy, he was treated for migraine headaches and back pain. He witnessed a terrible fire on the U.S.S. Dallas and saw many sailors "burned beyond recognition." In 1990 he was discharged because of a personality disorder.

The record of Capman's medical and psychiatric history over the next two decades is spotty. There are references to symptoms of depression and anxiety in 2001 that temporarily prevented him from working. In 2007 and 2008, he was treated for bipolar disorder, depression, and anxiety. He also reported that he experienced back pain and frequent, severe headaches, and was a recovering alcoholic.

Capman was incarcerated from early 2010 until early 2011 for manufacturing methamphetamine. His prison medical records note only hypertension and obesity as his then-current medical conditions. In prison Capman sought medical help for nightmares and sleeplessness. He was evaluated for posttraumatic stress disorder and anxiety disorder but did not meet the criteria for either diagnosis.

After his release from prison, Capman was treated at a Veteran's Administration facility for a host of physical and mental ailments. Doctors diagnosed bipolar disorder, posttraumatic stress disorder, personality disorder, and severe depression. He attended group therapy sessions for his posttraumatic stress disorder and reported nightmares and trouble sleeping. He also reported anxiety attacks when around crowds. Capman was also treated for lower back pain, which dated to an injury in the Navy. He got some relief from a transcutaneous electrical nerve stimulation unit, which sends electrical currents to relieve pain. His doctors also prescribed Tramadol (a painkiller), Sulindac (a nonsteroidal anti-inflammatory drug), and Cyclobenzaprine (for stiffness and spasms). In a doctor's visit in late 2011, his pain was recorded as stable. During a January 2012 examination, Capman's doctor noted that he had guarded partial range of motion in his lumbar spine. Also in 2012, his doctor diagnosed diabetes and treated him for frequent migraines (three or four times a week). He was diagnosed with sinusitis once, for which he was given medication. Finally, Capman's doctors continued to prescribe medication for hypertension.

In 2011 Capman applied for disability benefits and supplemental security income, listing on an initial Disability Report that he was "manic depressant and bipolar suicidal" and also noting that he took medicine for high blood pressure and back pain.

He claimed that his back pain prevented him from standing or walking for any length of time and that he could not go out in crowds or be in groups of more than three people because he feared having an anxiety attack. He added that he did not do well with authority, stress, or changes in his routine.

In a consultative mental examination in 2011, two psychologists, Neal Davidson and Lezlea Jones, confirmed that Capman suffers from mood disorder, posttraumatic stress disorder, borderline personality disorder, alcohol dependence, and cannabis abuse in remission. They reported, however, that Capman was "able to understand, remember, and carry out instructions" and his attention and concentration were adequate. Davidson and Jones concluded that Capman was "somewhat limited" in his ability to "perform activities and interact with the public without interference from psychologically based symptoms" because of his "irritability and reactive tendencies."

Psychologist Kenneth Lovko also evaluated Capman and completed two forms for the agency—the Psychiatric Review Technique form and the Mental Residual Functional Capacity Assessment ("RFC Assessment"). On the first form, Lovko checked boxes to record that Capman's mood disorder, posttraumatic stress disorder, borderline personality disorder, and alcohol dependence did not equal a listed impairment. In Section I of the RFC Assessment— effectively a worksheet on which a medical consultant sets forth summary conclusions— Lovko noted that Capman was moderately limited in six categories: understanding and memory (one category); sustained concentration and persistence (three categories); and social interaction (two categories). In Section III of the RFC Assessment, Lovko concluded that Capman's allegations of his symptoms were credible but his claims about their severity were not. Lovko explained that Capman's symptoms could "present some impediment to work situations with large numbers of people," but that "it does seem that [Capman] could deal with environments that have fewer persons in them, and where stress is limited." In Lovko's opinion Capman could carry out unskilled tasks, relate to others on a superficial basis, "attend to task[s] for sufficient periods of time," and manage the stress of unskilled work.

At his hearing before the ALJ, Capman testified about his mental and physical impairments, reiterating that he could not work because of anxiety attacks that occur when he is around too many people. He also claimed that his back pain prevented him from sitting or standing for long periods and that although he could walk a mile, he had not done so for two years. He testified that he took aspirin for his migraines instead of his prescribed medication because he did not like the side effects of the prescription

drug. He added that he experienced migraines twice a month and they lasted four to five hours.

Finally, Capman testified that he last worked at a hotel in 2009, when he was fired because he would "snap" when he was around too many people. Prior jobs—all short term—included stints as a collection clerk, a front-desk clerk, and a telemarketer.

A vocational expert ("VE") testified and responded to hypothetical questions from the ALJ about future work opportunities for an individual of Capman's age, education, work experience, and limitations. The ALJ first hypothesized an individual who could not do complex or detailed tasks but could perform simple, routine tasks that did not require working with the public or in close proximity or cooperation with others. The expert responded that a person with these limitations could not perform Capman's past work but could perform jobs at the medium exertional level—such as "stores laborer" or "hand packager"—as well as jobs at the light exertional level—such as "inspector and hand packager" or "folder of laundry products." When asked if an individual with limitations consistent with Capman's testimony could perform Capman's past work or other jobs, the VE responded that he could not. The VE explained that competitive employment would not allow a worker to be so "off task"— in the sense that he could not interact with others or sit or stand for long periods of time.

The ALJ applied the required five-step analysis, *see* 20 CFR §§ 404.1520(a)(4), 416.920(a)(4), and determined that Capman had not engaged in substantial gainful activity since the onset date (step one); that Capman's mood disorder, posttraumatic stress disorder, borderline personality disorder, and history of polysubstance abuse were severe impairments, but that his back pain and headaches were not (step two); that none of these impairments equaled a listed impairment (step three); that Capman could not perform his past work but had the residual functional capacity to perform a full range of work at all exertional levels provided he was limited to simple, routine tasks that did not require working with the public or in close proximity or cooperation with others (step four); and that given his age, education, work experience, and residual functional capacity, Capman could work as a stores laborer or hand packager (step five).

The Appeals Council denied Capman's request for review, precipitating this suit in district court. The district judge concluded that substantial evidence supports the ALJ's decision, and Capman now appeals.

## II. Discussion

### A. Concentration, Persistence, and Pace

Capman first argues that the ALJ's RFC findings do not adequately reflect his limitations in concentration, persistence, and pace—limitations that Dr. Lovko classified as "moderate" in a checklist in Section I of his RFC Assessment. The Commissioner responds that Section I of the form is merely a worksheet while Section III is the psychologist's bottom-line assessment, so the ALJ can reasonably rely on Section III. *See Smith v. Comm'r Soc. Sec.*, 631 F.3d 632, 636–37 (3d Cir. 2010).

The agency's Program Operations Manual System ("POMS") identifies the purpose of Section I of the RFC Assessment and instructs medical consultants to record and explain their conclusions in narrative format in Section III of the form:

> The purpose of section I … is chiefly to have a worksheet to ensure that the psychiatrist or psychologist has considered each of these pertinent mental activities and the claimant's or beneficiary's degree of limitation … . *It is the narrative written by the psychiatrist or psychologist in section III … that adjudicators are to use as the assessment of RFC.*

POMS DI 25020.010(B)(1), *available at* https://secure.ssa.gov/apps10/poms.nsf/lnx/ 0425020010 (emphasis added and bold omitted); *see Johansen v. Barnhart*, 314 F.3d 283, 289 (7th Cir. 2002) (accepting an ALJ's RFC assessment based on a psychologist's evaluation that "went further" and "translated" Section I observations into a mental RFC finding in Section III). Although an ALJ should not ignore limitations recorded in Section I, the POMS directs that "[t]he degree and extent of the capacity or limitation *must* be described in narrative format in Section III." *See* POMS DI 24510.063(B)(2), *available at* https://secure.ssa.gov/apps10/poms.nsf/lnx/0424510063 (emphasis added and bold omitted). So the ALJ may reasonably rely on the examiner's narrative in Section III, at least where it is not inconsistent with the findings in the Section I worksheet.

Lovko's notations in Section I and Section III are not inconsistent. The examiner explained in narrative form in Section III that Capman could adequately manage the stress of unskilled tasks. That Capman is moderately limited in his ability to complete a day or week of work without interruption, as noted in Section I of the form, does not mean that he could not function satisfactorily. A moderate limitation is not a complete impairment. *See Roberson v. Astrue*, 481 F.3d 1020, 1024 (8th Cir. 2007).

Moreover, the ALJ's RFC findings accurately reflected Lovko's assessment by restricting Capman to simple, routine tasks and limited interactions with others. Both the medical evidence and Capman's testimony support the finding that any limitations in concentration, persistence, and pace stem from Capman's anxiety attacks, which occur when he is around other people. Therefore, the limitations incorporated into the ALJ's RFC findings adequately addressed Capman's deficiencies in concentration, persistence, and pace. S*ee O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010) ("We also have let stand an ALJ's hypothetical omitting the terms 'concentration, persistence and pace' when it was manifest that the ALJ's alternative phrasing specifically excluded those tasks that someone with the claimant's limitations would be unable to perform."); *Simila v. Astrue*, 573 F.3d 503, 521–22 (7th Cir. 2009).

## B. Difficulty Accepting Instructions and Responding to Supervisors

Capman next argues that the ALJ failed to include a limitation reflecting his difficulty in accepting instructions and responding appropriately to criticism from supervisors—a limitation that Lovko had also marked as moderate on Section I of his RFC Assessment. To the contrary, we're satisfied that the ALJ adequately addressed this limitation. Lovko specifically concluded in his Section III analysis that Capman could relate to coworkers and supervisors on at least a superficial basis. And the ALJ accommodated the need for superficial interactions with supervisors in the RFC by limiting Capman to work that does not involve "close proximity or cooperation with others."

## C. Back Pain

Capman further argues that the ALJ erred by not including in the RFC an exertional limit to light-level work to account for his back pain. But the ALJ rejected Capman's testimony concerning his back pain as not credible, a determination that was not patently wrong. True, the ALJ used disfavored boilerplate at step four of his analysis, saying that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." *See Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014); *Bjornson v. Astrue*, 671 F.3d 640, 644–45 (7th Cir. 2012). But the ALJ made a more detailed credibility finding at step two when he determined that Capman's back pain did not qualify as a severe impairment, citing unexplained gaps in Capman's

medical treatment during the relevant period. *See* 20 C.F.R. § 404.1529(c)(3)(v); SSR 96–7p; *Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013); *Simila*, 573 F.3d at 519.

The ALJ also determined at step two that there was no objective medical evidence corroborating the limitations Capman claimed. An ALJ cannot disregard subjective complaints about pain based solely on the absence of objective medical evidence. *See Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004). But an ALJ may take the lack of medical evidence into account, as the ALJ did here. *See Schmidt v. Barnhart*, 395 F.3d 737, 746–47 (7th Cir. 2005). And an ALJ's decision should not be overturned simply because the relevant analysis is set forth at a different step of the process. *See Curvin v. Colvin*, 778 F.3d 645, 650 (7th Cir. 2015); *see also Moore v. Colvin*, 743 F.3d 1118, 1122 (7th Cir. 2014) (noting that use of boilerplate does not automatically discredit an ALJ's credibility determination).

## D. Migraines

Capman next argues that the ALJ should have included a limitation for the effects of his migraines on his ability to work. He claimed that he had migraines twice a month, whereas the VE testified that a single-day's absence would be acceptable to an employer. Capman misunderstands the VE's testimony, which was that one absence per month *beyond allotted sick time* would be unacceptable. Moreover, Capman submitted no evidence that his headaches had worsened or impaired his ability to work during the relevant time period. *See Pepper v. Colvin*, 712 F.3d 351, 364 (7th Cir. 2013); *Schmidt*, 395 F.3d at 746. Indeed, the evidence actually suggested that his migraines had improved.

## E. Diabetes, Hypertension, Hypertriglyceridemia, and Sinusitis

Capman also argues that the ALJ failed to account for his diabetes, hypertension, hypertriglyceridemia, and sinusitis. While an ALJ must consider all the claimant's ailments in combination and may not ignore lines of evidence, *see* 20 C.F.R. § 404.1545(a)(2); *Thomas v. Colvin*, 745 F.3d 802, 807 (7th Cir. 2014); *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009), Capman submitted no evidence to show how these particular ailments affected his ability to work. He now argues that his diabetes and related issues cause him to nap during the day, but he testified at the hearing that his naps were caused by boredom or prescription medication for other conditions. And he

offered no evidence about any limitations attributable to sinusitis, which he suffered from only once.

**F. Obesity**

Finally, Capman summarily argues that the ALJ erred by not acknowledging his obesity and its effect on his other medical conditions. True, an ALJ must consider the effect of a claimant's obesity when combined with other impairments. *See* SSR 02-1p; *Goins v. Colvin*, 764 F.3d 677, 681 (7th Cir. 2014); *Sienkiewicz v. Barnhart*, 409 F.3d 798, 803 (7th Cir. 2005). But Capman never submitted any evidence explaining how his obesity affected his ability to work or aggravated his other conditions.

AFFIRMED.