In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-1287

MARGARET CULLINAN,

*Plaintiff-Appellant,*

*v.*

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 15 C 11499 — **Mary M. Rowland**, *Magistrate Judge.*

ARGUED DECEMBER 12, 2017 — DECIDED DECEMBER 28, 2017

Before BAUER, RIPPLE, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge*. Margaret Cullinan appeals the denial of her application for Disability Insurance Benefits and Supplemental Security Income. She based her claim for benefits on several impairments, most of which arose after she suffered a stroke: anxiety, depression, peripheral blindness in one eye, diabetes, obesity, and sleep apnea. An administrative law judge determined that although Cullinan

has several impairments, she is not disabled. Cullinan argues that the ALJ erroneously discredited both her testimony and the opinion of her treating psychologist. We vacate the judgment and remand for further administrative proceedings.

## I. Background

Cullinan applied for disability benefits and social security income in March 2012 alleging vision problems, side effects from a stroke, diabetes, difficulty balancing, cervical cysts, and fatigue. The Social Security Commission denied Cullinan's application for benefits both initially and on reconsideration. She requested a hearing before an administrative law judge.

Cullinan worked as a live-in-home certified nurse's aide for 15 years. In May of 2011, she went to the hospital for headaches and blurred vision and was diagnosed with a possible occipital stroke. Initial tests showed 20/40 vision in her right eye and 20/25 in her left, and that she could walk normally. Follow-up examinations showed reduced peripheral vision in her right eye.

Cullinan's treating neurosurgeon, Dr. George Cybulski, completed a Medical Source Statement in October 2011 describing Cullinan's ability to work. Dr. Cybulski reported that Cullinan suffered from blindness in her right eye and weakness in her right arm and leg, needed a cane to walk, could occasionally lift and carry up to ten pounds, and could not sit, stand, or walk for more than one hour in an eight-hour workday without needing to lie down.

In August 2012 two of the Social Security Administration's consultative doctors examined Cullinan: psychologist Michael E. Stone performed a mental status exam, and internist Albert Osei conducted a physical exam. Based on Cullinan's report that she had vision and balance problems, anxiety, depression, and diabetes that collectively prevented her from working, Dr. Stone diagnosed her with depression and generalized anxiety disorder with panic attacks, and stated that she had a guarded prognosis, meaning she was unlikely to improve. Dr. Osei determined that Cullinan could walk up to half a block, stand, sit, and walk down stairs without difficulty, and that she had good balance while walking. His impression was that Cullinan had impaired peripheral vision in her right eye, diabetes, depression, and anxiety.

Two nonexamining state-agency consultants evaluated Cullinan's medical records and opined on her residual functional capacity. Psychologist Phyllis Brister completed a form assessment in September 2012 and opined that Cullinan had mild restrictions in daily activities and social functioning, and moderate difficulties maintaining concentration and interacting with the general public. In March 2013 psychologist David Gilliland mostly agreed with Dr. Brister's conclusions, except that he found that Cullinan had moderate difficulties in social functioning instead of mild.

Cullinan began treatment with Dr. John Canzona, a psychologist, in February 2013. (This was shortly before she received the decision denying her request for reconsideration of the Agency's initial denial of her claim.) During their initial appointment, Cullinan reported that the stroke "ru-

ined [her] life": she moved back in with her parents who "pick on [her]," she cannot work, and she watches television in her room all day. She said that because of the stroke and her various medications, she lost peripheral vision in her right eye, had difficulty balancing, and was often fatigued. Dr. Canzona found Cullinan's concentration adequate and diagnosed her with a major depressive disorder, and he rated her at a Global Assessment of Functioning ("GAF") score of 55, indicating moderate symptoms from her mental impairments.[1] Also, in February 2013 Cullinan had a hysterectomy and subsequently developed an infection.

Cullinan continued therapy with Dr. Canzona about once every two weeks through the end of 2013. She discussed her daily activities, mentioning that she did her parents' laundry and was "helpful around the house," cared for her cousin who lived in a nursing home, and occasionally attended concerts. During one session, she said that she wanted to reconnect with her former boyfriend, and in another she said she "met a man and spent some time with him." She mentioned helping her friend care for foster children with "developmental problems" and helping to care for one of her grandmothers. She said that she attended her parents' anniversary party and her cousin's wake and that she was anxious with "chest pressure" before both events. Finally,

---

[1] The GAF is a 100-point metric formerly used to rate overall psychological, social, and occupational functioning. AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32–34 (4th ed., Text Rev. 2000). In 2013 the American Psychiatric Association abandoned the flawed GAF system. *See Lanigan v. Berryhill*, 865 F.3d 558, 561 n.1 (7th Cir. 2017). Though noted by the ALJ, the GAF scores did not appear to factor into her analysis.

she reported wanting to work as a live-in nurse for the elderly and wanting to volunteer at an animal shelter.

In May 2013 Cullinan had a follow-up appointment with Dr. Regina Hall-Ngorima, her psychiatrist, and reported fatigue, pain, sleep problems, and feeling more depressed and anxious. Dr. Hall-Ngorima diagnosed Cullinan with insomnia and an adjustment disorder with depressed mood and assigned a GAF score of 65, reflecting mild symptoms.

Cullinan went to the emergency room in November with right-sided weakness and inability to walk without a walker. An examining physician concluded these were symptoms of Cullinan's anxiety.

In January 2014 Cullinan's treating internist, Dr. Lorenzo Monterubianesi, completed a physician's report. Dr. Monterubianesi had seen Cullinan quarterly since May 2011, shortly after her stroke. He said that her balance had returned to normal, she could lift up to ten pounds frequently, and she had full capacity to walk, stand, and sit. But Dr. Monterubianesi noted that her ability to perform activities of daily living was reduced up to 20% and she had a 20% to 50% reduced capacity for climbing and using public transportation.

Dr. Canzona, the treating psychologist, completed a Medical Source Statement in April 2014, and he rated Cullinan's ability to complete a normal workday or workweek as poor. He reported that she was unable to maintain attention and concentration for extended periods of time, perform at a consistent pace, or travel in unfamiliar places and use public transit.

At her administrative hearing in April 2014, Cullinan tes-
tified that twice after her stroke she tried to go back to work
but was unable to keep up with her patients and stopped
working after four days. She explained that she has no
peripheral vision in her right eye; she cannot see her right
hand when held next to her face. She testified that she could
not see her representative sitting to her right. She said that
her glasses help her keep balance, but she still stumbles
every other day. Regarding her anxiety and depression, she
stated that she suffers neck and chest pain, her legs get
weak, and she does not like to leave the house. Cullinan
explained that she naps one to four hours each day because
her medications leave her feeling groggy, she does not sleep
well at night, and her parents wake her up from sleeping on
the couch every morning between 5:30 and 6 a.m. She testi-
fied that she suffers weekly from severe headaches that last
up to five days and prevent her from being able to read or
watch television.

Cullinan also testified about her daily activities and
physical and mental limitations. She said she can only stand
for 20 minutes, sit for 40, and walk half a block. She testified
that while at home she makes beds, brews coffee, and loads
and unloads the dishwasher. She added that she visits her
cousin in the nursing home up to three nights per week and
that while visiting she tidies up but does not lift anything.

The ALJ then questioned a vocational expert, who re-
viewed the record and was present during Cullinan's testi-
mony. The expert said that given Cullinan's health limita-
tions, she would not be able to resume work as a nurse's
aide. The ALJ posed a hypothetical question about the
employment options of someone who was limited to light

work that did not require operating heavy machinery or driving, or climbing ladders, ropes, or scaffolding; had mild social functioning limitations and moderate difficulty concentrating; and could perform only routine tasks and follow simple instructions. Notably, the ALJ did not list peripheral blindness as a limitation. The vocational expert answered that such a person would be able to work as a laundry aide, cleaner/polisher, or marker/labeler. The expert also said that needing to take a two-hour nap every day would rule out all work.

In her written decision denying benefits, the ALJ applied the five-step analysis required by 20 C.F.R. § 404.1520(a) and concluded that Cullinan was not disabled. The ALJ determined that Cullinan had not worked since her occipital stroke on May 3, 2011 (step 1); that only her anxiety and depression constituted severe impairments (step 2); that these impairments, individually or collectively, did not equal a listed impairment (step 3); that she had the residual functional capacity to perform light work involving simple instruction and routine tasks that did not entail operating heavy machinery or driving, or climbing ladders, ropes, or scaffolds; that she could not perform her former work as a certified nursing aide (step 4); and that she could work as a laundry aide, cleaner/polisher, or marker/labeler (step 5).

In determining Cullinan's residual functional capacity, the ALJ determined that Cullinan's testimony concerning the intensity, persistence and limiting effects of her symptoms was "not entirely credible." Regarding Cullinan's psychological impairments, the ALJ gave no weight to her testimony or the opinion of Dr. Canzona, the treating psychologist who had concluded that Cullinan would be unable to complete a

normal workday due to her difficulties maintaining concentration, traveling in unfamiliar places, and using public transit.

The ALJ's adverse credibility determination and her decision to discount Dr. Canzona's opinion were each based on Dr. Canzona's treatment notes. In discrediting Cullinan the ALJ said that the notes show that Cullinan is "very active": she does household chores; cares for her cousin, grandmother, and a friend's foster child; goes to concerts; attended her parents' anniversary party and her cousin's wake; wants to resume working and to volunteer at an animal shelter; and goes on dates. Regarding Dr. Canzona's credibility, the ALJ said his report was inconsistent with his treatment notes and so was untrustworthy.

The ALJ instead gave "great weight" to the opinion of Dr. Brister, one of the nonexamining psychologists who had determined that Cullinan had only mild limitations in daily living activities and social functioning, and moderate difficulty maintaining concentration. The ALJ noted that Dr. Brister's assessment of Cullinan's residual functional capacity was consistent with her own. The ALJ also gave great weight to the other consulting psychologist, Dr. Gilliland, to the extent that he "generally affirmed" Dr. Brister, but she gave little weight to his finding that Cullinan had moderate difficulties in social functioning because, the ALJ said, it was not consistent with treatment records and Cullinan's activities.

Regarding Cullinan's physical impairments, the ALJ gave some weight to the opinions of the two state-agency physicians who had physically evaluated Cullinan; the ALJ accepted their assessment that Cullinan had only nonsevere

physical impairments. But the ALJ gave controlling weight to Dr. Monterubianesi's opinion about Cullinan's inability to lift heavy objects, so she limited Cullinan's residual functional capacity to light exertional work.

The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. *See Ghiselli v. Colvin*, 837 F.3d 771, 776 (7th Cir. 2016). Cullinan sought judicial review, and a magistrate judge, presiding by consent, *see* 28 U.S.C. § 636(c), affirmed the decision of the Commissioner. We review the magistrate judge's decision de novo and assess whether the ALJ 's decision is supported by substantial evidence in the record. *Lanigan v. Berryhill*, 865 F.3d 558, 563 (7th Cir. 2017).

## II. Analysis

Cullinan primarily argues that the ALJ erred by discrediting her testimony about the limitations caused by her impairments and the opinion of her treating psychologist, Dr. Canzona, and instead giving great weight to the Agency's nonexamining doctors. She challenges the conclusion that both her testimony and Dr. Canzona's opinion were inconsistent with Dr. Canzona's notes, which, the ALJ said, showed she was "very active."

We will overturn an ALJ's decision to discredit a claimant's alleged symptoms only if the decision is "patently wrong," meaning it lacks explanation or support. *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014). A credibility determination lacks support when it relies on inferences that are not logically based on specific findings and evidence. *Id.*

Here the ALJ's decision to discredit Cullinan and Dr. Canzona is unsupported by the record because the ALJ's

examples of Cullinan's daily activities and social interactions do not remotely describe a "very active" lifestyle. In *Murphy* we decided that the ALJ erred in concluding that the claimant's vacation undermined her claim of stroke-related impairments. *Id.* at 817. We noted that the ALJ did not determine what the claimant did on vacation, and we suggested a vacation relaxing on the beach would have been consistent with the claimant's testimony regarding the severity of her impairments. *Id.*

The ALJ in Cullinan's case drew similar impermissible inferences from her activities. For example:

- Cullinan performed household chores. The treatment notes say that Cullinan did her parents' laundry and was "helpful around the house." At the hearing she testified that she made beds, brewed coffee, and loaded and unloaded the dishwasher. Daily activities may be used to discredit a claimant's testimony. *See Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016) (citing 20 C.F.R. § 404.1529(c)(3)(i); SSR 96–7P, 1996 WL 374186, at *3; *Pepper v. Colvin*, 712 F.3d 351, 368–69 (7th Cir. 2013)). But the ALJ did not explain why doing these household chores was inconsistent with Cullinan's description of her pain and limited mobility. Nor is any inconsistency obvious, so the ALJ did not substantiate the finding that Cullinan's daily activities reveal any exaggeration of Cullinan's limitations. *See Ghiselli*, 837 F.3d at 777–78; *see also Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) ("The failure to recognize [the] differences [between activities of daily living and activities of a full-time job] is a re-

current … feature of opinions by administrative law judges in social security disability cases.").

- Cullinan cared for her cousin in the nursing home. Dr. Canzona's notes do not contain what Cullinan did for her cousin other than to encourage him to eat healthily; she added at the hearing that she straightened up his room but did not do anything that required lifting. This is similar to the work she did around the house. The dearth of information about what Cullinan did, how she got to the nursing home, and how long a period of time she assisted her cousin renders the ALJ's reliance on this activity unreasonable. *See Murphy*, 759 F.3d at 817; *see also Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) (requiring the ALJ assessing the claimant's credibility to "build an accurate and logical bridge from the evidence to [the] conclusion").

- Cullinan helped a friend care for young foster children. Again, the record is silent about how Cullinan helped her friend, so this activity gave the ALJ no information to factor into a credibility determination.

- Cullinan provided care for her ill grandmother who required "total care." Dr. Canzona's note contradicts this point: Cullinan did not attend to the grandmother who required total care because she was already caring for another grandmother. The record does not describe what this care entailed, so there was no basis upon which to infer that it was "total" care.

- Cullinan attended concerts. The record suggests that Cullinan attended two concerts in 2013, but again the

record provides no details suggesting that this was particularly "active" or social behavior, or that Cullinan used public transportation.

- Cullinan attended her parents' anniversary party and her cousin's wake. The record does not describe these family events, how Cullinan traveled to them, or her activity when there. Moreover, she expressed having chest pressure before each occasion. Going to these two events to fulfill family obligations is not indicative of a high level of social or physical activity.

- Cullinan discussed looking for work and wanting to volunteer at an animal shelter. Cullinan testified that twice after her stroke she tried to resume working as a nursing aide but stopped after four days each time because she was unable to keep up with the patients. A positive work history makes a claimant *more* credible, *Stark*, 813 F.3d at 689, and a desire to resume work similarly makes a claimant more credible, not less, *see Ghiselli*, 837 F.3d at 778 ("Persisting in looking for employment even while claiming to suffer from a painful disability might simply indicate a strong work ethic or overly-optimistic outlook rather than an exaggerated condition."); *see also Hill v. Colvin*, 807 F.3d 862, 868 (7th Cir. 2015) (noting that a desire to work is consistent with an inability to work). The expressed desire to do volunteer work is simply unenlightening.

- Cullinan went on dates. The record says that Cullinan *wanted* to reconnect with her ex-boyfriend and that at one point she "met a man and spent some time with him." These statements do not describe a pattern of dating that demonstrates a "very active" lifestyle.

> Moreover, Cullinan was likely "spending time with" several people during her alleged period of disability—her parents, for example. Perhaps the ALJ believed this interaction with one person was evidence of social functioning, but she did not say so; and in any case spending time with someone is too vague a descriptor to contradict Cullinan's alleged impairments.

In citing these questionable examples of a "very active" lifestyle to discredit Cullinan's account of how she is limited by her impairments, the ALJ did not rely on substantial evidence. Moreover, the ALJ did not discuss any of Cullinan's testimony in analyzing her residual functional capacity, so it appears that she gave the testimony no weight despite implying that it was at least partially credible (i.e., "not entirely credible").

Relatedly, Dr. Canzona's opinion of Cullinan's limitations, contrary to what the ALJ said, was not inconsistent with his own treatment notes, so the ALJ should not have ignored it. A treating doctor's opinion is entitled to controlling weight unless it is unsupported by the record. *Vanprooyen v. Berryhill*, 864 F.3d 567, 572 (7th Cir. 2017). An inadequate evaluation of a treating physician's opinion requires remand. *See Meuser v. Colvin*, 838 F.3d 905, 912 (7th Cir. 2016); *Scott v. Astrue*, 647 F.3d 734, 739–40 (7th Cir. 2011). Dr. Canzona treated Cullinan every other week for almost all of 2013. The ALJ said that Dr. Canzona's opinion should not carry controlling weight because it was contradicted by Cullinan's level of activity and thus lacked support in the record. Instead, the ALJ gave great weight to the opinions of nonexamining agency consultants.

But just as Dr. Canzona's treatment notes did not show that Cullinan was "very active" and therefore not believable, the notes also do not contradict Dr. Canzona's opinion of Cullinan's limitations. Attending concerts and family functions and spending some time with a man does not show that she is able to work, travel, or use public transportation. Further, his notes that she was able to focus during sessions do not conflict with his opinion that she cannot focus "for extended time periods." Because the ALJ did not adequately explain the conclusion that Dr. Canzona's notes were inconsistent with his opinion, the ALJ's decision to assign no weight to Dr. Canzona's opinion was error.

We are also troubled by the fact that the ALJ did not consider Cullinan's daily extended naps and frequent debilitating headaches in determining her residual functional capacity. No evidence in the record contradicted Cullinan's testimony about these limitations, so only the adverse credibility determination could explain the ALJ's omission. But if the credibility finding was erroneous, Cullinan could well be adjudged disabled: the vocational expert said that needing to take a two-hour nap every day would rule out all work. And no one mentioned the headaches, but if they were factored in, the case for disability would be stronger still. The ALJ has the burden to develop the record and assess whether symptoms are disabling. *See Yurt v. Colvin*, 758 F.3d 850, 860 (7th Cir. 2014).

Cullinan's remaining arguments are unpersuasive. First, she argues that the ALJ did not consider her sleep apnea when determining her RFC, but the ALJ expressly incorporated this limitation into her evaluation of Cullinan's attention and concentration. Cullinan also argues that the ALJ

should have given more weight to Dr. Cybulski, another treating physician, but Dr. Cybulski examined Cullinan only shortly after her stroke in 2011, and a treating physician without a longitudinal view is not entitled to controlling weight. 20 C.F.R. § 404.1527(c)(2); *see Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004). Cullinan's status soon after her stroke does not shed light on her physical and mental limitations years later. Finally, Cullinan challenges the hypothetical question posed to the vocational expert as incomplete because it did not include her partial blindness. To the extent the ALJ's exclusion of partial blindness from the RFC and hypothetical question was based on the flawed credibility assessment, the ALJ should reconsider the effect of Cullinan's partial blindness on remand.

To conclude, the ALJ's determinations that neither Cullinan nor her treating psychologist were credible are not based on substantial evidence. Because the determinations led the ALJ to deny Cullinan's application for benefits, they are not harmless errors. *See Ghiselli*, 837 F.3d at 778–79.

We VACATE the judgment and REMAND for further proceedings.