NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued July 6, 2016
Decided August 16, 2016

**Before**

RICHARD A. POSNER, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

No. 15-3314

| | |
|---|---|
| POLLY A. REED, | Appeal from the United States District |
|     *Plaintiff-Appellant*, | Court for the Northern District of Indiana, |
| | Fort Wayne Division. |
|     *v.* | |
| | No. 1:14-CV-080 JD |
| CAROLYN W. COLVIN, | |
| Acting Commissioner of Social Security, | Jon E. DeGuilio, |
|     *Defendant-Appellee*. | *Judge*. |

**O R D E R**

Polly Reed applied for Disability Insurance Benefits in 2011 when she was
50 years old. An administrative law judge concluded that the residual effects of injuries
to Reed's left leg, sustained in a 2010 motorcycle accident, constituted a severe
impairment. But the ALJ also concluded that Reed was exaggerating the physical
limitations caused by that impairment and that she retained the residual functional
capacity to perform her past relevant work as well as other jobs in the national and
Indiana economies. The Appeals Council denied review, and a district judge upheld the
denial of benefits. On appeal Reed criticizes the ALJ's assessment of her residual
functional capacity, the adverse credibility finding, and the conclusion that she was not

disabled for at least 12 months following the accident. We conclude that substantial evidence supports the denial of benefits.

Reed and her husband were riding his motorcycle when it was struck by a car in June 2010. She had skin loss and a large cut around her left knee, and she fractured her tibia and fibula. Dr. Stephen Wright, an orthopedic surgeon, inserted a rod and several screws into her leg to treat the tibia fracture. Reed was hospitalized for 12 days and ordered not to walk. A surgeon removed dead tissue around the area of the cut on her left leg and applied skin grafts. A week after her release from the hospital, Reed was still reporting constant, extreme pain in her left leg. Dr. Wright noted that X-rays of the area showed that the tibia and fibula fractures were well aligned and the orthopedic hardware in her tibia was intact and correctly positioned.

In early August 2010, Reed reported to Dr. Wright that she was experiencing intermittent sharp pain, the severity of which she rated as 5 on a 10-point scale. On physical examination she had some limitations in her range of motion when bending her left knee and pointing her foot down. Dr. Wright prescribed physical therapy to increase her strength, functional skills, and range of motion. X-rays of Reed's lower left leg did not show any problem with alignment or with the rod and screws.

Reed had appointments in mid-September 2010 with Dr. Wright and with Dr. Teresa Smith, her primary-care physician. Reed complained to Dr. Smith that her left leg continued to ache and swell, and the doctor observed that she walked slowly and used a cane. At the appointment with Dr. Wright 12 weeks after her accident, Reed rated her pain in her left leg as still 5 out of 10 and said that the pain increased with activity but physical therapy helped. Reed's left ankle was mildly swollen, and an X-ray of her left leg showed signs of bone healing in the left tibia but still a visible fracture line on that bone. Dr. Wright prescribed Norco (a hydrocodone/acetaminophen combination) for Reed's pain.

When Reed returned to Dr. Wright in November, 20 weeks after the accident, Dr. Wright noted that her pain was improving—now rated at 4 out of 10—and though Reed described the pain as constant, it was helped by the Norco, which she took occasionally. The doctor also noted that an X-ray showed that the fractures in Reed's tibia and fibula were healing well. Dr. Wright said that she could return to work "with regular duties," and he continued the Norco prescription.

Reed did not return to her manufacturing job, however, and neither did she obtain other work. Five months later, in April 2011, she returned to Dr. Smith, her

primary-care physician, complaining of pain in her left foot and left ankle, sometimes as bad as 7 out of 10. She told Dr. Smith that Dr. Wright had ignored these pains and the swelling in her left ankle, instead focusing exclusively on her fractures. She also told Dr. Smith that physical therapy had helped some but she had never regained full range of motion in her left ankle. Dr. Smith noted from her physical exam that Reed's gait was unassisted though she had an obvious limp on the left side. The doctor referred Reed to a podiatrist, Dr. Christopher Bussema.

When Reed consulted Dr. Bussema at the end of April, she explained that her left ankle ached and that the pain was made worse by standing and walking. Dr. Bussema noted a limited range of motion in Reed's left ankle, though X-rays showed good spacing and positioning in the joints around the ankle and only a slight deformity from the fractures. Dr. Bussema recommended custom orthotics and discussed conservative treatment options, including ice, immobilization, and pain relievers.

Reed returned to Dr. Bussema a week later and reported that her left-ankle pain had not abated and that she now was experiencing a burning sensation in the ball of her left foot. Dr. Bussema obtained another X-ray, which did not show anything new. He gave Reed an injection containing an anesthetic and a steroid to decrease the pain and inflammation, and in early May he supplied her with custom orthotics for her feet.

At the beginning of June 2011, Reed hired counsel and submitted her application for Disability Insurance Benefits, alleging onset on the date of her accident, June 20, 2010. Reed asserted that she had been unable to work since the accident because of the residual effects of her left-leg injuries, coupled with depression, anxiety, and high blood pressure. (Other than a passing reference to hypertension in her appellate brief, Reed does not mention these other conditions on appeal.) She listed employment from before the accident that included work as a molder, machine operator, and short-order cook. After applying for benefits, Reed returned again to Dr. Smith in mid-June and July, reportedly because of depression. Dr. Smith noted that she was walking normally, that her muscle tone was normal, and that she did not show any sign of "abnormal movements." The doctor did not record in her progress notes any complaint about pain in Reed's left leg, nor did she comment on Reed's range of motion in her left ankle.

In mid-July 2011 a state-agency consulting physician, Dr. Jonathon Sands, reviewed the medical record and assessed Reed's residual functional capacity. He opined that Reed could lift and carry up to 10 pounds frequently and 20 pounds occasionally. He stated that she could sit, stand, or walk for up to 6 hours each in an 8-hour workday. Dr. Sands concluded that Reed no longer could climb ladders, ropes, or

scaffolds but still could push and pull without restrictions and occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. Reed's application for benefits then was denied. After she requested reconsideration, another state-agency physician, Dr. Mangala Hasanadka, reviewed the record in August 2011 and concurred with Dr. Sands's assessment.

Reed's hearing before the ALJ did not occur until a year later, in September 2012. During that year, she had only limited contact with her physicians. In November 2011 Reed consulted Dr. Smith about a painful lump on the inside of her left ankle. In her progress notes Dr. Smith remarked that she had not detected any abnormality other than the lump. Reed walked normally and had full muscle strength in all of the tested muscle groups. An X-ray taken of the left ankle to assess the lump showed only that the tibia fracture was well healed, the fibula fracture was stable, and the ankle was well aligned, though with "mild degenerative changes." And after this appointment Reed did not mention the lump again.

Reed next returned to Dr. Smith nine months later, in August 2012. Again she complained that her leg was hurting, though she had not experienced recent trauma. Dr. Smith observed that her gait was stable without an assistive device, and a review of her extremities did not reveal any abnormality other than scarring from the past surgery on her left leg. The doctor's notes do not comment on Reed's range of motion in her left ankle, nor is there any mention of the painful lump that she had reported previously. During this visit, Reed acknowledged that Dr. Wright, the orthopedic surgeon, had invited her to follow up at any time but she hadn't needed to until recently.

A week later Reed did see Dr. Wright. She told him that she had experienced pain in her lower left leg for a year and that she had been feeling pain in her right forearm and tingling in her right hand for two months. She also reported a sharp, intermittent pain of 8 or 9 in severity that traveled, though the doctor's note did not describe where this pain was located. Dr. Wright detected tenderness and limited range of motion in Reed's neck when she leaned her head back or rotated it to the right. But her gait was normal, as was her range of motion in her right shoulder and right wrist. Reed reported minimal pain over the site of one of the surgical screws in her left leg and some mild tenderness at the site of the tibia fracture, but X-rays confirmed that the screws were still well positioned and the fractures well healed. Dr. Wright assessed mild osteoarthritis in Reed's right shoulder, degenerative disc disease and radiculitis (a pinched nerve) in her neck, pain from one of the screws in her leg, and tendinitis in her right arm.

Two weeks later during her testimony before the ALJ, Reed maintained that it took a year after the accident to achieve her current level of ability, but she is no longer improving. Six months after the accident, she had resumed driving and doing household chores, including cooking daily, washing dishes, vacuuming every other day, and dusting weekly. Vacuuming, she added, increases the pain in her left knee and her shoulder. She acknowledged that she had resumed riding as a passenger on her husband's motorcycle in the summer of 2011 and sometimes helps him with motorcycle maintenance tasks. Yet she insisted that she's unable to sit longer than 15 minutes before her left leg and left hip start hurting. She then must stand, Reed explained, but cannot do so for more than 20 minutes because she favors her right leg, which grows tired. And she cannot walk for more than five minutes without resting, Reed continued, and every day she uses a cane (though without a prescription). She can navigate stairs but uses a handrail and takes the steps one at a time. Reed testified that she can lift the weight of a case of soda with her left hand and a gallon of milk with both hands. She rated her pain without medication on a typical day to be 4 or 5 on a 10-point scale but mentioned that medication makes the pain minimal, about a 1. When asked about her symptoms during the hearing relating to her right arm and neck, Reed said that the arm was sore and that the pain had started two months earlier.

Based on Reed's testimony about the exertion required for her previous jobs, a vocational expert opined that her work as a short-order cook, though classified as light in the Dictionary of Occupational Titles, was medium work as Reed performed it. Her manufacturing jobs as a molder and machine operator, the VE continued, are classified as medium work but were light as Reed performed them. Applying the functional limitations described in Dr. Sands's assessment, the VE concluded that Reed can perform the work of a typical short-order cook but not the cooking job that she held previously. And she can work as a molder or machine operator as she performed those jobs in the past but not as they typically are performed. The VE acknowledged that Reed no longer can perform any of her past jobs if she must have the flexibility to sit or stand at will. But even so, the VE added, a significant number of light, unskilled jobs fitting this hypothetical, including information clerk, mail sorter, and order caller, exist in the national and Indiana economies.

After the hearing Reed supplemented the record with Dr. Wright's progress note from her appointment the same day as the hearing. She told Dr. Wright that her condition had not changed since her last consultation two weeks earlier and that she still was experiencing sharp and dull pains, which she rated as 8 or 9 on a 10-point scale and which occur with activity, but Dr. Wright's treatment record did not include any details

about where Reed had these pains or what activities exacerbated them. Dr. Wright surmised that the pain Reed reported in her tibia was attributable to the screws, which could be removed if Reed wanted. Reed also had reported left-knee pain, and Dr. Wright administered a cortisone injection. At this appointment Dr. Wright also reviewed with Reed an MRI of her neck (taken earlier that month). The MRI revealed stenosis (or narrowing of the spinal column) at two disc locations but no disc herniation. Dr. Wright suggested that for her back and right shoulder Reed should consult Dr. Alan McGee.

The ALJ denied Reed's application for benefits four months after the hearing. At Steps 1 and 2, the ALJ found that Reed had not engaged in substantial gainful activity since the motorcycle accident and that the residual effects of the injuries to her left tibia, fibula, and knee constituted severe impairments. The ALJ acknowledged that two months before the hearing Reed had first sought treatment for neck and right-arm pain, but the ALJ concluded that there was little evidence that these issues would last for 12 continuous months, *see* 20 C.F.R. § 404.1509, or cause more than minimal limitations to her ability to perform work-related tasks, *see id*. § 404.1521(a). At Step 3 the ALJ concluded that Reed's impairments did not satisfy a listing for presumptive disability.

At Step 4 the ALJ found that Reed could perform light work as defined in 20 C.F.R. § 404.1567(b), provided that she not climb ladders, ropes, or scaffolds and only occasionally balance, stoop, kneel, crouch, crawl, or climb ramps and stairs. The ALJ thought that Reed's statements about "the intensity, persistence and limiting effects" of her impairments were "not entirely consistent with or supported by the medical and other evidence," in particular Dr. Wright's treatment note from November 2010 (that Reed could return to work with regular duties), her doctors' observations that she walked normally without a cane, and the opinions of the state-agency physicians. Given this assessment of Reed's residual functional capacity, the ALJ concluded that she was capable of performing her past work as a molder or a machine operator (at the light exertional level that she performed those jobs in the past) or as a short-order cook (as that job typically is performed). And in the alternative, the ALJ proceeded to Step 5 and concluded that jobs Reed can perform with her limitations—unskilled, light occupations with an option to sit or stand at will—exist in substantial numbers in the national and Indiana economies.

Reed requested review by the Appeals Council and submitted additional records from treatment occurring after the hearing. At the end of September 2012, Reed was examined by Dr. McGee concerning pain in her neck, right shoulder, and right arm. Dr. McGee diagnosed cervical stenosis but noted that Reed had full range of motion in

her neck and simply instructed her on stretching and strengthening exercises that she could do at home. He also prescribed an anti-inflammatory medication. Then in October 2012, Reed returned to Dr. Wright concerning the reported pain affecting her left knee and lower left leg. Dr. Wright observed that she could bend her knee more than 120 degrees. Reed said that she still experienced intermittent, throbbing pain that she rated as 7 out of 10 but that the injection administered at the last appointment had completely relieved her pain for a week. Dr. Wright said that he would consider conducting surgery on the left knee and also removing the screws in her leg if her symptoms persisted, and he instructed her to follow up as needed. The following year, in May, Reed returned to Dr. Smith and reported having neck pain that radiates to her shoulders. Dr. Smith observed that Reed walked normally, she had full muscle strength in all groups tested, and her inspection and feeling of Reed's bones, joints, and muscles was unremarkable. The Appeals Council accepted the records from these additional appointments into the record. The Appeals Council denied Reed's request for review, and the district court upheld the ALJ's decision.

On appeal Reed's first argument is that the ALJ failed to include the limiting effects of her neck and right-shoulder pain when determining her residual functional capacity. She points out that limitations from nonsevere impairments must still be considered in this determination, *see* 20 C.F.R. § 404.1545(a)(2), and she argues that despite her neck and shoulder pain not qualifying as severe impairments, the ALJ still should have included a reaching limitation in her residual functional capacity.

But Reed ignores the ALJ's detailed discussion of the treatment records from August and September 2012 that address her complaints of neck and shoulder pain and the diagnostic findings concerning her neck. And the ALJ then explicitly tied these conditions to specific exertional limitations, reasoning that Reed's neck and shoulder pain would prevent her from lifting or carrying more than 20 pounds but would not rule out light work, *see id.* § 404.1567(b). Contrary to Reed's assertion, the ALJ did not "ignore entire lines of evidence"; the ALJ simply drew different conclusions from the documents than Reed would have liked.

Reed next contends that the ALJ placed too much emphasis on her ability to perform activities of daily living, and as a result impermissibly inferred that she was capable of full-time work. As Reed points out, we have criticized such inferences. *See Stark v. Colvin*, 813 F.3d 684, 688 (7th Cir. 2016); *Moore v. Colvin*, 743 F.3d 1118, 1126 (7th Cir. 2014); *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013). But the ALJ did not commit this error; although the ALJ summarized Reed's testimony about her ability to

do housework and other tasks, she never inferred from those statements that Reed was capable of full-time work. *See Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016) (noting that ALJ discussed claimant's performance of activities of daily living but did not equate it with ability to work). Reed also accuses the ALJ of overlooking the fact that she took breaks when performing these chores, but the ALJ explicitly noted these details.

Reed also argues that the ALJ ignored her consistent work history in finding some aspects of her testimony not credible. Although we have said that ALJs should look favorably on a claimant's positive work history, *see Hill v. Colvin*, 807 F.3d 862, 868 (7th Cir. 2015), we've also said that "work history is just one factor among many, and it is not dispositive," *Loveless*, 810 F.3d at 508 (noting that other factors provided substantial support for adverse credibility finding). In this case the ALJ's credibility finding rests on a number of inconsistencies undermining Reed's complaints that her leg injury prevents her from working. For example, the ALJ pointed out that while Reed testified that she uses a cane a few times each day, both Dr. Smith and Dr. Wright on various occasions observed that Reed could walk normally, and Dr. Smith concluded that she was stable without an assistive device. Dr. Wright cleared Reed to return to work "with regular duties" by November 2010 and noted that Reed's remaining pain, although moderate, was minimized with medication. The ALJ's credibility assessment thus is tied to evidence in the record and is not patently wrong, so we will not disturb that assessment. *See id.*; *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015); *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013).

Finally, Reed argues that even if the ALJ properly concluded that she did not establish a current or continuing disability, she at least was entitled to a closed period of benefits. According to Reed, the ALJ did not adequately explain why she did not satisfy the standard for disability for at least the 12 months following the accident. While it is true that the ALJ did not separately explain the basis for concluding that Reed was not disabled for at least the 12 months after the accident, there was no reason to state the obvious. The ALJ's discussion of the medical evidence from that period makes evident her conclusion that Reed's injuries had healed and ceased to prevent a return to work long before the one-year anniversary of the accident. The ALJ rightly emphasized Dr. Wright's note clearing Reed to work in November 2010—five months after the accident—since her pain was managed by medication and an X-ray confirmed that the fractures were healing well. The ALJ also observed that Reed had received an unspecified orthotics device to treat issues she raised in April 2011 concerning her left foot and left ankle and that when she returned in June 2011 to her primary-care physician, Dr. Smith, the doctor's findings from a musculoskeletal examination were

normal. As the months passed after she applied for benefits, Reed seems to have shifted her focus from the motorcycle accident to unrelated conditions involving her neck and right arm, and that effort did not strengthen her claim of a closed period of disability.

Because we conclude that substantial evidence supported the ALJ's denial of Reed's application for Disability Insurance Benefits, we affirm the district court's judgment upholding that decision.