NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued December 18, 2019
Decided January 10, 2020

**Before**

DAVID F. HAMILTON, *Circuit Judge*

MICHAEL B. BRENNAN, *Circuit Judge*

MICHAEL Y. SCUDDER, *Circuit Judge*

No. 19-1363

| | |
|---|---|
| GERALD LOUIS BROWN, JR., *Plaintiff-Appellant*, | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. |
| *v.* | No. 17 C 2631 |
| ANDREW M. SAUL, Commissioner of Social Security, *Defendant-Appellee*. | Sheila Finnegan, *Magistrate Judge*. |

**O R D E R**

Gerald Brown suffers from hand tremors, along with a variety of other physical impairments. In 2014, he applied for disability benefits. An administrative law judge issued a partially favorable decision awarding a closed period of disability benefits after finding that Brown was disabled but later achieved medical improvement. The district court upheld the ALJ's decision. In our view, however, the ALJ unreasonably concluded that Brown's tremors were an "on and off" problem that so improved by July 8, 2015 as to eliminate any disability finding by that date. Because substantial evidence does not support the ALJ's decision, we vacate the judgment and remand for further proceedings.

**I**

Brown, now 58, applied for Title II disability insurance benefits and supplemental security income on July 1, 2014. He alleged impairments including diabetes, high blood pressure, high cholesterol, and coronary artery disease. Until March 2014, Brown had worked as a command-center operator, where he monitored cameras, managed alarms, and answered phones. That same month, he visited the emergency room for shortness of breath and was diagnosed with a pulmonary artery blood clot. He underwent a triple bypass the next month, after which he stopped working.

A few days after his emergency room visit, Brown saw neurologist Kenneth Holmes, reporting numbness and tingling in his hands and feet, as well as tremors and shaking. In April 2014, at a consultation with neurologist Eric Ericson, Brown complained of yearlong tremors that had gradually worsened. The tremors bothered Brown when he used his hands. Dr. Ericson noted a "moderate action tremor, more mild postural," meaning that the tremors manifested when Brown used his hands. Dr. Ericson further observed that the tremors were "severe enough that [they] merit[] treatment" but declined to prescribe medicine because the stress of yet another medication could exacerbate the tremors.

After Brown applied for disability benefits, he had an internal medicine consultative exam in October 2014 with Dr. Charles Carlton, an examiner with the Bureau of Disability Determination Services. During a series of tests, Brown exhibited no difficulty with "fine and gross manipulative movements of the hands and fingers."

Brown saw his neurologist, Dr. Ericson, again in November 2014, reporting that his tremors had worsened. Brown said that the tremors limited certain activities—for example, he could not write, put a key into a lock, or use a computer mouse. Upon examination, however, Brown was able to draw a spiral and pour water from one cup to another without tremors. And, although Brown was unable to write legibly, Dr. Ericson noticed no tremors during writing.

In December 2014 and February 2015, Brown saw his primary-care physician, Sandhya Nagubadi, for a multitude of symptoms, including shaking in both hands and worsening tremors. At the February 2015 visit, Dr. Nagubadi completed a disability assessment form, limiting Brown to only occasional handling (gross manipulation) and fingering (fine manipulation) and referring him back to Dr. Ericson.

A few days later, Brown saw Dr. Ericson, who observed a "moderate-to-severe postural/action tremor." Brown could not draw a spiral, write his name legibly, or pour water from one cup to another without spilling. Dr. Ericson did not think the tremors were medication-induced.

Brown saw Dr. Ericson one more time in June 2015. Brown reported that he could not put a key in a door lock or hold a sandwich. Dr. Ericson recorded that Brown's "moderate to severe action tremor" became "quite severe" when Brown poured water from cup to cup. He referred Brown to a movement disorder center and prescribed a new medication, topiramate, for the tremors. And because Dr. Ericson did not accept Brown's new insurance, he offered to refer Brown elsewhere.

On July 7, 2015, Brown saw Dr. M.S. Patil, a consultative examiner. At this visit, Brown could turn a doorknob, squeeze, pick up a coin or pen, button, zip, tie shoelaces, and turn a page—all of which contributed to Dr. Patil recording that Brown had no difficulty with fine or gross manipulation of the hands or fingers. Dr. Patil diagnosed Brown with, among other conditions, diabetes, chronic hypertension, and post-triple bypass status but expressly noted no involuntary tremors. Brown's listed medications included topiramate.

From January 2016 to April 2016, Brown had appointments to manage various problems (such as diabetes and chest pain) with his new primary-care doctor, Cornelius Rogers, and cardiologist Dr. Looyenga. No complaints of tremors appear in their reports, but Brown remained on topiramate.

Brown's medical records were also reviewed twice by state-agency medical doctors, once at the application level in November 2014 and again at the reconsideration stage in July 2015. Neither doctor opined that Brown had any manipulative limitations with his hands.

After the agency denied Brown's application, an administrative hearing proceeded before an ALJ on June 8, 2016. Brown testified that in July 2015 (the period the ALJ first inquired about), he had a number of medical issues, including "severe tremors." He testified that the tremors prevented him from holding a sandwich, seasoning food, or going fishing (because he could not bait a hook). Brown added that his hands trembled every day, but whether they trembled "depends on the position." He had not seen a neurologist since 2015. When the ALJ asked Brown to explain the gap in neurology treatment, Brown said that he had lost his union-sponsored insurance in December 2014 and that, after he obtained public-assistance insurance, his neurologist,

Dr. Ericson, had told him that he did not accept the new insurance. Brown also needed a new primary-care physician because of his new insurance, and he could not obtain referrals to specialists until he had done so. But Brown testified that he had a neurology appointment scheduled for the next week and that it had taken several months to get this appointment.

The ALJ asked a vocational expert to consider the work available to a person of Brown's age and experience who had a variety of specified physical limitations. The VE opined that the hypothetical claimant could perform Brown's past work as a command-center operator. But, the VE testified, if that person could perform only occasional (as opposed to frequent) bilateral handling and fingering, he could not do that job.

The week after the hearing, Brown visited neurologist Syed Ahmed, as planned, and later submitted Dr. Ahmed's report to the ALJ. The report described Brown's complaint of persistent tremors over the "past several years" that occurred when he tried to write or eat. Dr. Ahmed also observed that Brown had "mild to moderate postural tremors which become severe when he tries to hold anything in his hands," as well as "mild intention[al] tremor." Dr. Ahmed prescribed a new tremor medication, clonazepam, and referred Brown to a movement-disorder specialist.

Applying the administration's five-step analysis, the ALJ determined that from March 21, 2014 through July 7, 2015 Brown could not perform his past work or any other jobs existing in significant numbers in the national economy and was thus disabled during that time period. To determine if Brown's disability continued, the ALJ then went through the applicable eight-step analysis, 20 C.F.R. §§ 404.1594(f), 416.994(b)(5), and concluded that medical improvement occurred as of July 8, 2015—the date of the consultative exam with Dr. Patil—because Brown did not suffer from tremors after that point. Without tremors, the ALJ reasoned, Brown could perform "frequent" instead of "occasional" bilateral handling and fingering and therefore could work as he did in the past as a command-center operator.

The ALJ observed that Brown's claim of significant tremors was "inconsistent" with the "lack of treatment or follow-up" after July 2015. Further, when Brown began seeing his new primary-care physician (and his new cardiologist), he did not complain of tremors. The ALJ recognized that neurologist Dr. Ahmed observed tremors in June 2016 and did not discount that finding. But the ALJ was of the view that the recorded tremors at that time did not establish that the tremors had been "ongoing and persistent after July 2015" to the extent that they interfered with his ability to work. Brown's disability thus ended on July 8, 2015.

The Appeals Council denied review, and the district court upheld the ALJ's denial of benefits.

**II**

We review the ALJ's decision under the deferential "substantial evidence" standard, but we will not "scour the record" for reasons to uphold the decision. *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014). An ALJ must support her determination using medical evidence in the record. *Id.*

A

The evidence does not support the ALJ's view of the medical record. The ALJ improperly disregarded Brown's description of his tremors as an ongoing problem depending on the position of his hands. Because Brown did not complain of tremors from July 2015 to April 2016, the ALJ found that the record did not support ongoing and persistent tremors after July 8, 2015.

But we cannot agree that substantial evidence supports this finding of medical improvement. First, to the extent that the ALJ relied on Dr. Patil's July 2015 assessment that Brown had no difficulty with fine or gross manipulative movements of his hands and fingers, the tests Dr. Patil performed were not the ones noted to produce the tremors. Accordingly, it is an overstatement of the medical record to conclude it definitively shows that Brown's tremors disappeared.

Second, the ALJ did not support her conclusion that Brown's lack of tremor complaints for several months showed the absence of tremors during that time. The physicians who examined Brown during this period (Dr. Rogers, a family practitioner, and Dr. Looyenga, a cardiologist) did not perform the tests that historically produced Brown's tremors, such as drawing a spiral, writing his name legibly, or pouring water from cup to cup. So there is no affirmative evidence that Brown no longer experienced any tremors during those activities. Third, and relatedly, the ALJ erred in stating that Brown did not complain again of tremors between July 2015 and June 2016. After Brown began seeing Dr. Rogers in January 2016 for primary care, he obtained a referral to see a neurologist, whom he saw in June 2016. Dr. Rogers renewed Brown's prescription for topiramate in January 2016, only six months after Brown last saw Dr. Ericson for his tremors. The ALJ's analysis nowhere accounted for this evidence. The lack of tremor complaints during this sliver of time—six months—does not support a conclusion that tremors were absent during this time period.

It is possible that Brown's tremors were well-controlled sometime after July 2015, as the record reflects that Brown remained on topiramate through the first three months of 2016. Whether Brown's tremors were well-controlled is relevant to whether he achieved medical improvement, because conditions that can be controlled with medication are not disabling. *See Prochaska v. Barnhart*, 454 F.3d 731, 737 (7th Cir. 2006). But the ALJ did not base her decision on an inference that Brown's tremors were well-controlled by medication, and we can review only the reasons an ALJ uses to support her conclusions. *Shauger v. Astrue*, 675 F.3d 690, 695–96 (7th Cir. 2012).

Nor does the record support the ALJ's observation that Brown had no "good explanation for the delay" between neurology visits. The short gap coincides with the termination of Brown's union health insurance in December 2014. Brown testified that it took him a couple months to obtain public-assistance insurance in March 2015, and that he learned only later (in June 2015) that his neurologist did not accept the new insurance. Nor did Brown's primary-care doctor accept the new insurance, so Brown had to establish a treatment relationship with a new primary-care doctor and then get a referral to a neurologist. The ALJ opined that "if his tremors were of such a severe nature," it would not have taken more than a year to see a neurologist after getting Medicaid. We see this observation as speculative, as nothing in the record contradicts the sequence of events that Brown testified about. *See Murphy v. Colvin,* 759 F.3d 811, 816 (7th Cir. 2014) (faulting ALJ for not asking "important questions to determine if Murphy's actions were justifiable"); *see also Hill v. Colvin*, 807 F.3d 862, 868 (7th Cir. 2015) (faulting ALJ for not considering how claimant would have paid for a specialist).

B

Relatedly, after reviewing Dr. Ahmed's opinion, the ALJ did not properly ground her decision with a medical opinion that Brown's tremors were "on and off again." As Brown contends, the ALJ could not determine how Dr. Ahmed's observation of tremors in June 2016 affected the persistence of the tremor condition without obtaining an updated medical review of the evidence by a state-agency doctor.

An updated medical review was required before the ALJ could determine the significance of Dr. Ahmed's findings of tremors. We have repeatedly found error when an ALJ determined the significance of medical findings on his or her own. For example, we have remanded when the ALJ relied on his own assessment of mental-health treatment notes, *Moreno v. Berryhill*, 882 F.3d 772, 729 (7th Cir. 2018); concluded that a physician's report and MRIs were "similar" to existing evidence, *Stage v. Colvin*,

812 F.3d 1121, 1125 (7th Cir. 2016); and summarized the results of an MRI herself instead of subjecting the MRI to medical scrutiny, *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014). In *Moreno*, we rejected the Commissioner's argument that newer mental-health treatment records showed improvement and so would not have made a difference to the state-agency reviewer's opinion. 882 F.3d at 729. The error was that the ALJ made his *own* assessment of the recent treatment records to conclude that they showed improvement. *Id.* So too here: the ALJ independently decided that Dr. Ahmed's diagnosis was not evidence that the condition persisted after July 2015.

The ALJ did not cite medical evidence to support her inference of an "on and off again" diagnosis of tremors, or tremors that "could improve or worsen." *Stage*, 812 F.3d at 1125; *see also Goins*, 764 F.3d at 680. The ALJ noted that Dr. Ahmed "may have" referred Brown to a movement specialist and prescribed a new medication, but she reasoned that these actions did not constitute evidence that the tremors were "ongoing and persistent after July of 2015." The ALJ did not mention Dr. Ahmed's note that Brown's tremors become severe when he tries to hold anything (or Brown's own report that his tremors depend on the "position" of his hands)—something that might be relevant to his ability to handle or finger objects. Without medical input, the ALJ could not reliably make the inference that Dr. Ahmed's June 2016 treatment notes reflect a reemergence, rather than a continuation, of the tremors.

C

Finally, the ALJ erred when she determined that Dr. Nagubadi's February 6, 2015 opinion, which limited Brown to only occasional handling and fingering, did not extend past July 2015. By that time, Brown had stopped seeing Dr. Nagubadi. And, in July 2015, the consultative examiner did not observe tremors. July 2015 also marks the beginning of Brown's gap in neurology treatment.

But there is no inference to be drawn about the absence of follow-up visits with Dr. Nagubadi after June 2015—Brown stopped seeing her because he changed insurance. At the time Dr. Nagubadi rendered her opinion on Brown's limitations, she was undisputedly Brown's primary-care doctor, and the ALJ accepted her contemporaneous assessment.

Further, the subsequent gap in neurology treatment from July 2015 onward is not, as the Commissioner contends, inconsistent with Dr. Nagubadi's opinion that Brown could handle and finger objects only occasionally. The treatment gap, as we explained, coincides with Brown's move to public assistance insurance in March 2015

and establishment of treatment in January 2016 with a new primary-care physician who then renewed his tremor medication and referred him to a neurologist.

For these reasons, we VACATE the judgment and REMAND the case for further proceedings.