In the

# United States Court of Appeals

### For the Seventh Circuit

———————

No. 16-3653

MELISSA VANPROOYEN,

*Plaintiff-Appellant*,

*v.*

NANCY A. BERRYHILL, Acting Commissioner of Social
  Security,

*Defendant-Appellee*.

———————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 14 C 6755 — **Young B. Kim**, *Magistrate Judge*.

———————

ARGUED JULY 6, 2017 — DECIDED JULY 21, 2017

———————

Before POSNER, KANNE, and SYKES, *Circuit Judges*.

POSNER, *Circuit Judge*. Melissa Vanprooyen applied for
Disability Insurance Benefits and Supplemental Security In-
come, claiming disability based on a litany of maladies. An
administrative law judge found her impairments to be se-

vere but not disabling and denied benefits. The Appeals Council of the Social Security Administration denied review, and the district court (a magistrate judge presiding by consent) upheld the administrative law judge's decision, precipitating this appeal.

Vanprooyen initially claimed to have become disabled in March 2010, when she was 26 years old and fell down a flight of stairs and suffered a brain hemorrhage. She also alleged a history of post-traumatic stress disorder, short-term memory loss, attention-deficit hyperactivity disorder, anxiety, seizures, and fibromyalgia.

Already by March 2009 Vanprooyen's personal physician, Dr. Dorothy Jones, had prescribed generic Xanax to treat her anxiety and panic attacks. In July, after she had begun inpatient drug treatment, Dr. Jones noted that she was taking a different anti-anxiety medication and pronounced her "medically stable." In October and December a psychiatrist named Harlan Alexander treated Vanprooyen for anxiety, depression, and bipolar disorder. During one session Vanprooyen revealed a history of addiction and said her Xanax prescription kept running out because she must "double it to make it work."

Her fall on the stairs caused a traumatic brain hemorrhage and brain contusion in the left hemisphere, which required her hospitalization. An EEG (electroencephalogram) performed to rule out epileptic activity showed mild brain damage. After a week she was discharged from the hospital with a doctor's note saying that she could resume working after her next neurosurgical appointment, which would be in a week or two. She was prescribed medication, including Ultram, for general pain, migraine headaches, and seizures.

A week later Vanprooyen saw Dr. Alexander. She told him she'd experienced strong headaches since the fall and had run out of the pain medication given her by the hospital doctors. The psychiatrist prescribed her Abilify, Zoloft, Trazadone, and Xanax.

A month after her fall, Vanprooyen had a neurosurgery follow-up by a Dr. Nassir Mansour, who declared she'd "made a very good recovery." She was alert, her cranial nerves intact, had full strength, and was "very keen to go back to her job" as a waitress. But just a week later she suffered a tonic-clonic (i.e., grand mal) seizure. She had another seizure in the emergency room and was taken to intensive care suffering from a subdural hematoma (bleeding under the skull that can cause serious brain damage, including death). Dr. Jones treated her at the hospital and noted that her seizure medication had been discontinued. A neurologist obtained a CT scan (a scan for determining internal injuries) and noted that it showed softened brain tissue. He opined that Vanprooyen "may be relatively stable" but said she should take anti-epileptic medication for at least two years. He ruled out driving for six months, climbing to any height, using machinery, drinking alcohol, showering without assistance, or working more than eight hours a day. Though complying with the limitations imposed by him, Vanprooyen continued to have headaches, and a couple of weeks later the doctor changed her anti-seizure medication—which however she stopped taking almost immediately because it made her drowsy.

In December 2010 she suffered another serious seizure, and the neurologist reduced her work ceiling to six hours a day while also stressing the importance of her taking her

medication. A few weeks later he reviewed a new EEG, which revealed abnormalities in Vanprooyen's brain capable of causing seizures.

In January 2011, Vanprooyen described to Dr. Alexander, the psychiatrist, worsening anxiety, migraines, and difficulty sleeping. At her next appointment she reported that her mother had thrown out her Xanax. The Xanax had helped, so Dr. Alexander refilled the prescription.

Vanprooyen delivered a baby in October 2011. She hadn't suffered a seizure since December 2010 even though another physician had changed her anti-seizure medication because of negative side effects, noting that Vanprooyen's medical issues included the use of methadone to combat drug addiction.

Eight days after her child was born, Vanprooyen went to the emergency room after experiencing several days of pain (which she scored at 7 of 10) radiating from her lower back to her legs. An emergency room doctor attributed the pain to fibromyalgia. After leaving the hospital she returned to Dr. Alexander and told him she'd been anxious throughout her pregnancy and wanted to resume taking Xanax (which apparently she'd stopped taking while pregnant). Although the doctor refilled the prescription, Vanprooyen's anxiety didn't abate, and soon she began reporting memory loss, greater difficulty sleeping, worsening generalized pain, and headaches. Dr. Alexander added probable PTSD and fibromyalgia to his diagnoses.

At the end of 2011 Vanprooyen changed psychiatrists, seeing Dr. Paul Carter from then until May 2012, which is when the medical record in this case ends. She told him that

anxiety and poor attention were her principal problems. He agreed with Dr. Alexander's diagnoses of generalized anxiety disorder, bipolar disorder, PTSD, and fibromyalgia but added opiate dependency.

She visited two rheumatologists in 2012 concerning her fibromyalgia. She reported having been diagnosed with the disease 10 years earlier with an average pain level of 4 or 5 out of 10 and greater pain in cold weather. One of the doctors diagnosed Vanprooyen as "diffusely tender at 18/18 points and multiple control points." The other suggested that she visit a fibromyalgia clinic, but the record is silent on whether she did so.

In May 2012, Dr. Michael Stone, a state-agency clinical psychologist, examined Vanprooyen, diagnosed generalized anxiety disorder with panic attacks, ADHD, PTSD, short-term memory loss, seizures, "brain damage," and fibromyalgia, and called her a "good informant" who could "remember a good degree of her past history." During the examination she had "exhibited problems maintaining a consistent level of attention and concentration." He termed her prognosis "guarded" and said that given her "emotional adjustment and medical difficulties" she was "unable to manage benefits [on] her own behalf at this time."

A month later a state-agency physician, Dr. Bharati Jhaveri, reviewed the medical record and opined that Vanprooyen must avoid ladders, ropes, and scaffoldings because of her head injury, seizures, and fibromyalgia but could sit, stand, or walk up to 6 hours each during an 8-hour workday and also could lift 10 pounds frequently and 20 pounds occasionally. He concluded that she retained the ability to work.

Another state-agency psychologist, Dr. Ellen Rozenfeld, also reviewed the medical record and opined that, because of sustained limitations in concentration and persistence, Vanprooyen "would be moderately impaired for detailed/complex tasks but adequate for completion of routine, repetitive tasks." Likewise, in September 2012 a second state-agency physician, Dr. Glen Pittman, having reviewed the medical record agreed with Dr. Rozenfeld regarding Vanprooyen's limitations in concentration and persistence.

In October 2012, a new psychiatrist wrote that Vanprooyen's "ability to maintain focus, mental organization and memory is impaired." He rated as "fair" or "poor" her ability to comprehend, remember, or follow instructions, but assessed most of her social skills as "good."

The same month Dr. Jones conducted a medical-source assessment of her fibromyalgia, identifying her symptoms as multiple tender points, nonrestorative sleep, chronic fatigue, morning stiffness, frequent and severe headaches, numbness, tingling, and anxiety. She wrote that Vanprooyen's pain and muscle tenderness affected her daily, and rated her pain at 7 out of 10. She concluded that Vanprooyen must move every 20 minutes, cannot stand more than 2 hours at a time, and must take unscheduled breaks—that she was "incapable of even 'low stress' work" and would probably miss work more than 4 days per month.

The Social Security Administration had denied benefits initially in June 2012 and did so again on reconsideration in September 2012. At a hearing before an administrative law judge in April 2013, Vanprooyen described how her medical issues affected her daily life. Her fiancé was working part-time with a varying schedule. Vanprooyen cared for their

infant daughter with the assistance of her mother. Although she was able to change the baby's diaper, she couldn't hold her daughter in her arms for long because she weighed 21 pounds. After her fall down the stairs she'd resumed waitressing three days a week but struggled with balance, writing, memory, and strength. Her coworkers helped out, but she stopped working because "it wasn't worth my coworkers to have to carry my weight."

Vanprooyen testified at the hearing that about three times a week she suffers a migraine on the left side where she was injured in the fall. To recover from a migraine she must isolate herself in a dark, quiet room, but when caring for her daughter she has no choice except to "deal with it." She further testified that she experiences short-term memory loss, that her fibromyalgia pain occurs mostly in her back and knees and is treated with nonprescription medications and methadone, and that she no longer can take prescription pain medication, other than methadone, given her history of addiction. Her fiancé testified, corroborating Vanprooyen's account of her migraines and memory issues.

During the hearing a vocational expert testified that Vanprooyen couldn't perform her past work given the residual functional capacity described by the administrative law judge (capable of occasionally balancing, reaching, climbing stairs and ramps, kneeling, crouching, and crawling; limited to assisting with simple, routine tasks that can be learned through short demonstrations; and unable to work around hazardous conditions, operate a motor vehicle, or endure loud environments) but could work as a counter clerk, cashier, or a shipping and routing clerk. But he acknowledged that she is unemployable if she will be off

task or pace 25% of the time, will miss 4 or more days per month, cannot sit, stand, or walk continuously for at least 4 hours during an 8-hour workday, or will require special supervision to sustain an ordinary routine.

The administrative law judge rejected Vanprooyen's account of disabling limitations, stating that the medical record revealed a "good recovery" after her fall, that her seizures were being controlled with medication, that she continued to engage in a "wide range" of daily activities, and that with help from coworkers she had continued working at "substantial gainful activity levels" for 20 to 21 months after the fall and had stopped working only after giving birth.

The administrative law judge gave "substantial" weight to the opinions of the stage-agency physicians because, in her view, those doctors had provided "a good synopsis of the evidence" and offered opinions "consistent with the overall record." She gave "some" weight to the neurologist who had predicted—seven days before Vanprooyen's first seizure—that she could return to her job and maintain a normal life despite her fall down the stairs, and purported to give "great" weight to the neurologist who had begun treating Vanprooyen after that first seizure, yet disregarded his limiting her to working only 6 hours a day and gave "little" weight to the medical source statement from Vanprooyen's personal physician, Dr. Jones, because she'd limited Vanprooyen to "less than sedentary exertional work," a restriction the administrative law judge called "excessive in light of the medical evidence of record and her activities of daily living." The Appeals Council of the Social Security Administration denied review of the administrative law judge's decision, which then was affirmed by the district

court thus precipitating this appeal to us. Vanprooyen points to the administrative law judge's flawed credibility assessments of her and her fiancé and disregard for the opinions of her treating physicians, and notes that in finding her not credible the administrative law judge had overemphasized her daily activities—and equating daily activities with an ability to work can lead to reversal. See *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012).

Of particular significance, Vanprooyen points out that the administrative law judge misunderstood the significance of her employment before her onset date (that is, the date several months after her fall down the stairs when her disability compelled her to quit work). The fact that she worked *before* the onset date doesn't negate the possibility that she became disabled by the onset. *Goins v. Colvin*, 764 F.3d 677, 679 (7th Cir. 2014); *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012). Between her fall in March 2010 and her onset in October 2011 she worked only three days a week. Part-time work is not good evidence of ability to engage in full-time employment, especially as she was able to continue working part-time only because some managers gave her easier shifts and other preferential treatment. She also received help from coworkers, took unscheduled breaks, and wrote everything down without abbreviation—accommodations that the administrative law judge mentioned only in passing and sometimes failed to mention at all.

She is also correct that after recounting at some length the favorable testimony of her fiancé, the administrative law judge never explained why that testimony shouldn't lead to a favorable assessment of her credibility. It wasn't logical for

the administrative law judge to discredit Vanprooyen while dismissing without explanation a corroborating witness who supported her contentions.

Vanprooyen further contends that the administrative law judge improperly discounted the opinions of treating sources in rejecting the views of her personal physician, neurologist, and psychiatrist. We agree with Vanprooyen that the administrative law gave no logical reason for discounting the opinions of these doctors, such as Dr. Jones. A treating physician's opinion trumps the conclusions of agency consultants—in particular those who never examined the claimant—unless the limitations articulated by the treating physician are not supported by the record. See *Engstrand v. Colvin*, 788 F.3d 655, 662 (7th Cir. 2015). While it's true that Dr. Jones had seen Vanprooyen only once or twice a year since 2005, neither of the agency's consulting physicians had ever examined her. The administrative law judge also rejected Dr. Jones's opinion because it rested mainly on Vanprooyen's reports of pain. That, too, was error, because Dr. Jones's medical-source statement concerned only Vanprooyen's fibromyalgia, which cannot be measured with objective tests aside from a trigger-point assessment. And that assessment showed that Vanprooyen was "[d]iffusely tender at 18/18 points and multiple control points." See *Sarchet v. Chater*, 78 F.3d 305, 306–07 (7th Cir. 1996) (discussing challenge of diagnosing fibromyalgia and unavailability of objective tests); Suleman Bhana, "Fibromyalgia," *American College of Rheumatology* (March 2017), www.rheumatology.org/I-Am-A/Patient-Caregiver/ Diseases-Conditions/Fibromyalgia (noting that causes of fibromyalgia are unclear and diagnostic tools lacking). An "ALJ may not discredit a claimant's testimony about her

pain and limitations solely because there is no objective medical evidence supporting it." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009); *Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) ("Pain is always subjective in the sense of being experienced in the brain.").

The administrative law judge also gave little weight to the psychiatrist who opined that Vanprooyen has "fair or poor mental abilities." The administrative law judge declared that opinion inconsistent with other medical evidence, including "treatment records that generally indicate that the claimant's mental status examination findings were normal and she reported improvement with medications." Wrong; the treatment records do not indicate a finding of "normal" mental status. The only mention of "normal" in the psychiatrist's progress notes says that Vanprooyen's *motor* skills were "within normal limits." The administrative law judge disregarded all the psychiatrist's other notes, covering a period of six months, reporting that Vanprooyen had only fair judgment and insight and that her mood was okay at times but anxious and distraught at others. The administrative law judge also disregarded Dr. Alexander's three years of psychiatric treatment without even mentioning him in the decision. And while Vanprooyen did report some improvement with medication, there were times when her medication did not improve her symptoms and she had to change medications and doses.

Notably the administrative law judge failed to mention that a state consultative examiner who had given Vanprooyen a mental-status examination concluded that she was unable to manage her own money because of her "emotional adjustment and medical difficulties." This omission

was especially serious because at least two of the three jobs that the administrative law judge found that Vanprooyen could do—cashier and counter clerk—involve handling money. Instead, without any logical explanation, the administrative law judge gave substantial weight to the opinions of consulting physicians who had never examined Vanprooyen, saying only that they had provided "a good synopsis of the evidence" and that "their opinions are consistent with the overall record." "An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).

Because of the serious deficiencies in the administrative law judge's analysis, we reverse the decision of the district court and remand the case to the Social Security Administration for further proceedings consistent with this opinion.

REVERSED AND REMANDED.